**WELLS FARGO BANK, N.A., Trustee for the Holders of Banc of America Commercial Mortgage, Inc., Mortgage Pass–Through Certificates, Series 2003–2, by and through its Special Servicer, Orix Capital Markets, LLC, Appellant,**

v.

**HB REGAL PARC, LLC, BH Regal Parc, LLC, Harbinder Singh, and Bhupinder Singh, Appellee.**

No. 05–10–01428–CV.

Court of Appeals of Texas, Dallas.

Aug. 29, 2012.

Rehearing Overruled Nov. 29, 2012.

Jeffrey Joyce and Ben Wickert, Joyce, McFarland & McFarland LLP, Houston, TX, for Appellant.

Brett Field, Mark Stromberg and Aric L. Stock, Stombert & Associates, PC, Dallas, TX, for Appellee.

Before Justices BRIDGES, FITZGERALD, and LANG.

## OPINION

Opinion By Justice BRIDGES.

Wells Fargo Bank, N.A., trustee for the holders of Banc of America Commercial

Mortgage, Inc., mortgage pass-through certificates series 2003–2, by and through its special servicer, ORIX Capital Markets, LLC (Trustee) appeals the trial court's post-foreclosure deficiency judgment against HB Regal Parc, LLC, BH Regal Parc, LLC, Bhupinder Singh, and Harbinder Singh. In three issues, Trustee argues the trial court erred by (1) not finding appellees liable for the full deficiency balance of the underlying loan, (2) finding the fair market value of the property at foreclosure was $19.5 million, and (3) failing to hold appellees liable for $1.6 million in damages due to actual waste. In four cross-points, appellees argue the trial court erred in awarding damages for actual waste and finding appellees misappropriated rents received, and the evidence is legally and factually insufficient to support the trial court's award of damages related to misappropriation of rents. Appellees argue that, if this Court should grant relief on either of appellees' cross-points, the evidence is factually insufficient to support the trial court's award of attorney's fees, and their settlement offer pursuant to rule of civil procedure 167 must be considered for purposes of offsetting the damage award. We affirm the trial court's judgment.

On January 5, 2007, appellees purchased Regal Parc apartments in Irving, Texas by assuming an existing loan. The loan was generally non-recourse to the borrower, meaning the lender's recovery in the event of the borrower's default was limited to a recovery of the property with no recourse to the borrower. However, this provision was subject to certain "carve outs" or exceptions under which the lender would have the right to recover from the borrower. Among other things, the loan had a "single purpose entity" clause providing as follows:

Section 6.1 (a) Borrower has not and will not ... (vi) commingle its assets with the assets of any other person; (vii) incur any debt ... other than (A) the Debt, (B) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (1) unsecured, (2) not evidenced by a note, (3) on commercially reasonable terms and conditions, and (4) due not more than sixty (60) days past the date incurred and paid on or prior to such date, and/or (C) financing leases and purchase money indebtedness incurred in the ordinary course of business relating to Personal Property on commercially reasonable terms and conditions; provided however, the aggregate amount of the indebtedness described in (B) and (C) shall not exceed at any time three percent (3%) of the outstanding principal amount of the Note.

Section 15.1(a) of the loan set forth the non-recourse nature of the loan and provided the lender would not sue for, seek or demand any deficiency judgment from borrower, except as otherwise provided in section 15.1. Section 15.1(b) of the loan provided borrower would be personally liable to lender on a joint and several basis for losses due to:

(i) fraud or intentional misrepresentation by borrower; (ii) borrower's misapplication or misappropriation of rents received by borrower after the occurrence of an Event of Default; (iii) borrower's misapplication or misappropriation of tenant security deposits or rents collected in advance; (iv) the misapplication or the misappropriation of insurance proceeds or awards ... (vii) any act of actual waste or arson by borrower ... (viii) borrower's failure following any Event of Default to deliver to lender upon demand all rents and books and records relating to the property....

Section 15.1(c) of the loan provided that, notwithstanding the foregoing, the agreement of lender not to pursue recourse liability as set forth in section 15.1(a) would become null and void and the debt would be fully recourse to borrower in the event of a default of any of the covenants set forth in Article 6 or Article 7 of the loan or in the event of a voluntary bankruptcy or insolvency proceeding.

The purchase price for the 560–unit apartment complex was $25,390,000, and Harbinder Singh and Bhupinder Singh paid $2,792,000 cash as earnest money and a down payment at the time of the purchase. On September 1, 2008, appellees committed an event of default by failing to make monthly payment under the note. In December 2008, Trustee accelerated all amounts due under the note. On January 6, 2009, Trustee was the winning bidder at the foreclosure sale with a bid of $12,000,000. The outstanding balance on the loan after foreclosure was $12,953,996.21, inclusive of principal, accrued interest, late charges, and yield maintenance premiums as provided in the loan documents.

Trustee sued appellees, asserting a deficiency of more than $11.6 million remained on the loan. Trustee alleged appellees were liable for the entire deficiency because they breached various single purpose entity requirements set out in Section 6 of the loan agreement by "borrowing from affiliates, assuming and paying the debts of affiliates, failing to properly allocate shared expenses and to properly segregate its business from that of affiliates, failing to maintain adequate capital, failing to remain solvent and to pay its own liabilities only from its own funds." Trustee alleged appellees breached their obligation to maintain the property and not commit waste, and Trustee was required to expend over $2.1 million to restore the property to acceptable condition and/or comply with various City of Irving regulations, ordinances, and orders.

In a subsequent trial before the court, Harbinder Singh testified that Clubview, another of the Singh's properties, paid utility deposits for Regal Parc in January 2007 because Regal Parc did not have a bank account at that time. Trustee generated a document, exhibit 84, showing payments going in to Regal Parc and coming out to the Singhs or affiliated properties, and the document characterized as "loans" transfers between different affiliated entities the Singhs owned. Harbinder testified all of the monies were tracked by his accountant, Victor Sutaria. Harbinder made it "very clear" to Sutaria to keep all of the Singh's different entities separate because "documents require that." Harbinder testified "about $106,000" more money went into Regal Parc than was taken out. Sutaria was the accountant for the Singhs' other business entities, and he kept separate books and prepared separate tax returns for the different entities. Revenue from operations at Regal Parc "only went into Regal Parc bank accounts," Harbinder testified, and if money was paid out of Regal Parc to a vendor, partner, or capital account, it was paid by check. Harbinder provided check stubs to Sutaria so he could record and book all transactions.

The Trustee's exhibit 84 showed money coming in to Regal Parc from Clubview and Rush Creek, and Harbinder testified the money was used to cover shortfalls in revenue. Harbinder testified he believed he was permitted to put more money in to Regal Parc if there was not enough money to pay for expenses, and "we were putting our own money in there." Harbinder testified it was a "very hard decision" to stop paying the Regal Parc loan on September 1, 2008. The decision meant that the

Singh's nearly $3 million investment in Regal Parc was "a big loss." The Singhs were not in a position to put more money into Regal Parc without having to borrow it because "due to the recession, all the properties were slowing down, so we didn't have this option."

Harbinder testified he contacted the lender in August 2008 and offered to turn the property over to the bank, but the bank did not immediately come and take over the property. While waiting for the lender to foreclose, the Singhs considered the options of leaving the keys and walking out, but they "wanted to turn over under good terms to the lender." Regarding money that was still coming in from operating the property, Harbinder testified the money was "money of the lender, whatever we were collecting," and it would go to the lender after payment for the expenses of operations. The Singhs paid past-due bills, and the City of Irving had asked that certain repairs be made. The forty-five-year-old property had "a lot of sewer problems" that "required most of the money" to be spent on repairs. Harbinder testified the Regal Parc property manager, Sonia Heer, told him he needed to hire an independent contractor to do repairs, and Harbinder authorized Heer to do so. Harbinder testified it was his opinion that the approximately twenty-eight-acre Regal Parc complex was "largely in the same condition on the day [he] bought it as it was on the day it was returned, notwithstanding normal wear and tear."

Heer testified she was the Regal Parc property manager and was responsible for managing the money at Regal Parc, writing checks, making sure the money was accounted for properly, and balancing the check book. Heer also worked with Sutaria, Regal Parc's accountant. When asked whether Heer would obtain cash for Regal Parc by "securing a loan" from one of the Singh's other properties, Heer testified as follows: "I asked the owners for money every time I needed funds for Regal Parc. So they had asked me sometimes to write out a check to Regal Parc. I don't know if they were loans or not, but it was money that was directed by them to go ahead and use to operate Regal Parc. I don't know if they were loans or not, but it was money that was directed by them to go ahead and use to operate Regal Parc."

Heer testified she sometimes wrote the word "loan" on a check. Heer testified: "Well, to me, when I put the word loan on the check, it was a mental note for me, and that's something that I saw what was happening prior to me starting work for them. I'm not sure if it was a loan and if that's how it was booked in the books." When again pressed on the issue of whether other properties made loans to Regal Parc, Heer testified: "There was money put into accounts from other properties. I'm not sure—they didn't tell me that this was a loan. This is like I said. I thought it was, and I made a note for myself, because at times they would ask me to write the same amount of check back to the property. So to me, that seems like a loan, but they didn't tell me to put that." Heer testified there were no promissory notes to evidence any loans.

Zaki Ayad, a civil engineer who had previously prepared approximately 2800 property condition reports, testified he inspected the property immediately after the foreclosure. Ayad prepared a thirty-two-page report indicating Regal Parc was in "fair to poor condition." The report indicated Regal Parc needed $1,119,882 in immediate repairs. At trial, Ayad testified it would take $1.399 million "to bring the property to a functioning status." Ayad's report contained breakdowns of the costs associated with repairs in various areas of the property and detailed evaluations of

the condition of the property. Ayad testified many of the conditions requiring repair were the result of poor maintenance. Specifically, Ayad testified to foundation problems, broken stairs, plumbing problems, and problems in the pavement and parking areas. Ayad testified $239,000 was necessary for immediate repairs to the pavement and parking area to prevent people from tripping and damage to cars using the parking area.

The trial court questioned Ayad about which problems requiring repairs "would have happened ... fairly recently." The trial court asked Ayad to go through his report and identify which problems arose during 2007 or 2008. Ayad went through the report noting problems with pavement and parking requiring $239,000 in repairs, site amenities requiring $165,000 in repairs, and utilities and sewer requiring $49,000 in repair. Ayad also testified that problems with foundation movement, leaking roofs, and electrical infrastructure required immediate repair, and the trial court had Ayad's report listing dollar amounts for repairs in these areas. Ayad testified he was reasonably certain the problems requiring immediate repair had arisen during appellees' ownership of Regal Parc.

Sutaria testified he was certified as a CPA in Texas in 1978 and had experience handling the accounting for approximately 200 hotels and motels and thirty apartment complexes. Sutaria was the accountant for Regal Parc from the time Singhs acquired the property in 2007 and also prepared the tax documents for the property. The Singhs told Sutaria to keep Regal Parc's books completely separate from other entities. Sutaria testified Regal Parc's bookkeeping was conducted in a manner consistent with the single-purpose entity rules in Article 6 of the loan document. Sutaria testified Regal Park was

"absolutely not" commingling its assets with other affiliated companies owned by the Singhs. All of Regal Parc's income was first deposited into Regal Parc's bank account. Sutaria testified he was not obligated to treat checks noted as loans on a check stub as loans "because there was no loan documents at all, and it was partner's contribution or partner's repayment." Sutaria testified the Trustee's exhibit 84 showing money going in and out of Regal Parc showed $105,241.88 more going into Regal Parc than going out.

The trial court entered findings of fact and conclusions of law finding, in part, that appellees did not commingle assets with any other entities or individuals or violate Article 6 of the loan agreement. Thus, the trial court found the loan agreement remained a non-recourse obligation. The trial court found appellees committed $600,000 in actual waste from January 2007 through the date of foreclosure for which they were liable under section 15.1(b)(vii) of the loan agreement. The trial court found total actual waste from August 21, 2003, the origination date of the loan which appellees assumed, to foreclosure was $1.6 million. Concerning rents, the trial court found appellees' right to receive and hold rents was automatically terminated upon the Event of Default on September 1, 2008; appellees misapplied and misappropriated rents totaling $238,101.61 by making payments to vendors, contractors, and others after their license to collect rents terminated; and misapplied and misappropriated rents by "improperly repaying loans to affiliates in the amount of $46,000 . . . ." The trial court subsequently entered judgment against appellees in the amount of $1,082,804.16, plus attorney's fees. Both sides filed notices of appeal.

■ In its first point of error, Trustee argues the trial court erred in failing to

find appellees liable for the full deficiency balance of the loan. Specifically, Trustee argues the trial court found appellees improperly repaid "loans to affiliates in the amount of $46,000," thereby violating Article 6 of the loan agreement and triggering the full-recourse provision of section 15.1(c) of the loan agreement. In making this argument, Trustee argues "Article 6 of the Loan Agreement provides that the Borrowers shall not 'incur any debt, secure or unsecured' except for limited circumstances not applicable here."

 If a trial court makes findings of fact and conclusions of law, we may review the fact findings for legal and factual sufficiency. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). In reviewing a legal sufficiency challenge to the trial court's fact findings, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 827 (Tex.2005). When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which an opposing party bears the burden of proof, the challenge must be sustained when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Service Corp. Int'l v. Guerra,* 348 S.W.3d 221, 228 (Tex.2011). More than a scintilla of evidence exists to support a finding if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Id.* Conversely, evidence conclusively establishes a vital fact when the evidence is such that reasonable people could not disagree in their conclusions. *See City of Keller,* 168 S.W.3d at 814–17.

 When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it has the burden of proof, that party can prevail only if it demonstrates that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex. 2001). We reverse the ruling for factual insufficiency of the evidence only if the ruling is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We review de novo the trial court's legal conclusions based on the findings of fact to determine their correctness. *BMC Software,* 83 S.W.3d at 794. Some of the challenged fact findings are better characterized as conclusions of law, and we will review those portions accordingly. *See Ray v. Farmer's State Bank,* 576 S.W.2d 607, 608 n. 1 (Tex.1979) (trial court's labels not controlling). Specifically, the interpretation or construction of an unambiguous contract is a matter of law to be determined by the court. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex. 2003). Thus, the trial court's determination that the underlying loan agreement remained a non-recourse obligation is better characterized as a conclusion of law. *See Ray,* 576 S.W.2d at 608 n. 1. Accordingly, we review this determination de novo. *BMC Software,* 83 S.W.3d at 794.

Section 6.1(a) of the loan agreement at issue provided "Borrower has not and will not ... (vi) commingle its assets with the assets of any other person; (vii) incur any debt ... other than (A) the Debt, (B) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (1) unsecured, (2) not evidenced

by a note, (3) on commercially reasonable terms and conditions, and (4) due not more than sixty (60) days past the date incurred and paid on or prior to such date." The only evidence that the transfers of cash to and from affiliated complexes constituted "loans" is a Trustee-generated exhibit which lists transfers to affiliated complexes as "loans."

Heer testified she did not know whether the transfers were loans, and she wrote "loan" on certain documents as a "mental note" to her. None of the owners of Regal Parc told Heer the transfers were loans. Harbinder testified "we were putting our own money in there" to cover shortfalls in revenue. The record shows the "loans" were not evidenced by a note and were the Singhs' "partner contribution or partner's repayment" to keep Regal Parc operating. The trial court appears to have made its finding that $46,000 in "loans to affiliates" were improperly repaid by adding together the amounts characterized as "loans" to affiliated entities on Trustee's exhibit 84. Exhibit 84 indicated the "loans" were repaid after the Event of Default on September 1, 2008. As payments made from rents after the Event of Default that terminated appellees' right to receive and hold rents, appellees were liable for such improper payments under section 15.1(b)(vii) of the loan agreement. The trial court specifically found that appellees did not commingle assets with any other entities or individuals or violate Article 6 of the loan agreement and concluded the loan agreement remained a non-recourse obligation. It appears, in finding $46,000 in "loans to affiliates" were improperly repaid, the trial court was not entering a finding that "loans" had been made but was using the terminology used in Exhibit 84 to identify payments improperly made after the Event of Default. We conclude the improper repayment of $46,000 in "loans" did not convert the underlying loan into a full recourse loan. We overrule Trustee's first issue.

In its second issue, Trustee argues the trial court erred in finding the value of the property at foreclosure was $19.5 million. Because we have concluded the loan remained a non-recourse obligation, the amount of any deficiency between the value of the property at foreclosure and the amount of the loan is irrelevant. Accordingly, we need not address Trustee's second issue.

█ In its third issue, Trustee argues the trial court erred in awarding only $600,000 in damages for actual waste. Specifically, Trustee argues the trial court should have awarded $1.6 million, the total amount of waste that occurred before and after appellees assumed the loan. In making this argument, Trustee relies on section 5 of the loan assumption agreement which provides in pertinent part:

5. Assumption and Ratification

(a) Borrowers hereby assume, jointly and severally, and agree to comply with all covenants and obligations contained in the loan documents as the same may be modified by this Agreement and henceforth shall be bound by all the terms thereof. . . .

(b)[Guarantors] hereby assume, jointly and severally, and agree to comply with all covenants and obligations of Borrower Principal (as defined in the loan documents) contained in the loan documents to which Borrower Principal is an obligor or party and henceforth shall be bound by all terms thereof. Without limiting the foregoing, [Guarantors] hereby assume the obligations of Borrower Principal . . . with respect to . . . Article 15 of the Loan Agreement.

Trustee notes further that appellees assumed covenants in Article 5 of the loan agreement to "cause the Property to be

maintained in a good and safe condition and repair" and "not to commit or suffer any waste of the Property." Trustee argues appellees assumed the representation by the former owner that the property was in "good condition, order, and repair," and there were no "structural or other material defects or damages." Trustee argues that, read together, these provisions show appellees "represented that, as of the Assumption Date, the Property was in a 'good and safe condition' and that there was no actual waste present." Therefore, Trustee argues, appellees are liable for "all actual waste committed to the Property since the inception of the Loan."

■■■ In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). The intention of the parties is discovered primarily by reference to the words used in the contract. *Preston Ridge Fin. Servs. Corp. v. Tyler*, 796 S.W.2d 772, 775 (Tex. App.-Dallas 1990, writ denied). Further, to determine the parties' actual intent, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker*, 650 S.W.2d at 393. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.*

Under the assumption agreement, appellees agreed to comply with the loan documents and "henceforth" to be bound by all terms of the loan documents. Trustee cites no provision of the assumption agreement or loan documents referring to appellees' assumption of liability for undisclosed waste committed by the prior debtor. Appellees undertook to be bound by the loan documents provisions prohibiting waste

"henceforth." We conclude the words used in the contract indicate a clear intention to hold appellees liable for waste and other provisions of the loan documents "henceforth" from the date they assumed the loan. *See Coker*, 650 S.W.2d at 393; *Preston Ridge*, 796 S.W.2d at 775. Therefore, the trial court did not err in holding appellees responsible only for their portion of the total waste that occurred after their assumption of the loan. We overrule Trustee's third issue.

■■■ In their first cross-point appellees argue the evidence is legally and factually insufficient to support the trial court's award of damages for actual waste. Specifically, appellees argue there is no evidence appellees committed any waste, much less waste in an amount of $600,000. On the contrary, the trial court had before it Ayad's detailed report concerning immediate repairs. The trial court elicited Ayad's testimony concerning which problems requiring immediate repair were reasonably certain to have arisen during appellees' ownership of the property. Based on this record, we conclude the evidence is legally and factually sufficient to support the trial court's finding that appellees committed waste totaling $600,000. *Guerra*, 348 S.W.3d at 228; *Cain*, 709 S.W.2d at 176. We overrule appellees' first cross point.

■■■ In their second cross point, appellees argue the trial court erred in finding appellees misappropriated rents received. Alternatively, appellees argue the evidence is legally and factually insufficient to support the award of damages for misappropriation of rents. Under the loan agreement, appellees' right to collect and hold rents was terminated following the Event of Default on September 1, 2008. There is evidence in the record that ceasing payments on the loan eliminated approximately $200,000 per month in debt service. Yet

appellees continued to collect rents and make payments they argue were necessary to manage and operate the property. Harbinder testified the money that continued to come in from operating the property was "money of the lender, whatever we were collecting."

The record contains documentation supporting the award of $238,101.61 in misappropriated rents in the form of an itemized list as part of exhibit 84. As to the $46,000 misappropriated to repay "loans" to affiliated entities, we previously noted this amount reflects payments made to affiliated entities after the Event of Default and after appellees' right to collect rents had terminated. Under these circumstances, we conclude the trial court did not err in finding appellees misappropriated rents, and the evidence is legally and factually sufficient to support the trial court's award of damages for such misappropriation. *See Guerra,* 348 S.W.3d at 228; *Cain,* 709 S.W.2d at 176. We overrule appellees' second cross point. Because of our disposition of appellees' first and second cross points, we need not address appellees' remaining cross points.

We affirm the trial court's judgment.