In the MATTER OF the Estate
of Charles Joesph KAM,
Deceased.

No. 08–14–00016–CV

Court of Appeals of Texas,
El Paso.

February 29, 2016

John Luther Shumaker Jr., Dallas, TX, for Appellant.

David M. Pyke, Pyke & Associates, PC, Dallas, TX, for Appellee.

Before McClure, C. J., Rodriguez, and Hughes, JJ.

## OPINION

YVONNE T. RODRIGUEZ, Justice

Carol Kam appeals a bench trial order denying her application to probate the purported last will of her deceased father, Charles Joseph Kam. The will Carol submitted to the court completely disinherits her brother, David Kam. David asserts that the trial court correctly rejected the will offered by Carol because it was not properly executed and because it was the product of Carol's undue influence on Charles. He also argues that the trial court was justified in finding that Carol did not offer the will to probate in good faith.

We reverse and render judgment admitting the purported will to probate, and remand for further proceedings.[1]

## BACKGROUND

### Robert Kant's Death and Aftermath

Two tragedies struck the Kam family between 2011 and 2012: the death of a father, Charles, and the death of his son, Robert. Both deaths spawned contentious probate litigation in the Dallas courts, replete with two lawsuits, an eviction attempt, tit-for-tat allegations of fraud and forgery, complaints with the State Bar, and a family polarized into two camps.

Although this particular case concerns the validity of Charles Kam's will, the roots of this dispute between Carol and David trace back to actions taken after

Charles' late son Robert was diagnosed with pancreatic cancer. In the aftermath of the diagnosis, Robert Kam created the Robert S. Kam Trust to manage his assets. It is undisputed that Robert amended the Trust's terms shortly before he died to redistribute certain assets within the Trust and to name David as trustee. Robert also named David as his estate's executor.

Following Robert's death, David assumed the role of trustee and began clashing with Robert's adult son Justin over control of a house held by the Trust. David also attempted to submit Robert's will to probate. Carol and Justin contested the validity of both Robert's will and the Trust, accusing David of mismanaging trust assets and misappropriating Robert's estate. Animosity from that legal dispute bled out into the family, with Charles Kam's surviving children all eventually aligning against David in the litigation in Robert's case. This created the backdrop for the current litigation at bar.

### Charles Kam's Reaction to the Emerging Feud

Carol Kam, the family's youngest daughter, was Charles Kam's caretaker in the months before his death at age ninety. Although witnesses testified that Charles was mentally sharp and still driving two months before he died, Charles had also suffered a stroke that weakened him physically, and according to David, he experienced occasional memory loss. Charles lived with a roommate at his home in Dallas, and would often visit Carol, who lived nearby. David also kept in regular phone contact with Charles. Charles' other son Tom, who lived in Austin, maintained a long-distance relationship with his father and spoke to him almost every day. Charles' daughters Cheri and Cindy had

1. We hear this case on transfer from the Fifth Court of Appeals in Dallas.

limited contact with Charles in the months leading up to his death.

While the will contest in Robert's case was pending, Carol told Charles that she suspected David was conspiring with his attorney and Robert's girlfriend to steal Robert's estate. Both David and his counsel repeatedly denied that allegation at trial. Tom testified that Charles shared Carol's concerns over David's management of Robert's estate.

At some point following Robert's death, Carol opened her father's mail and learned that David had been named as sole beneficiary of Charles Kam's Veterans Administration Life Insurance Policy. Previously, the policy had allegedly named both Tom and Robert as beneficiaries. Carol informed Charles of the change, and according to her, Charles became very upset, stating that he never made the change.[2]

Carol testified that Charles then instructed her to find his will, but she could not—the will was missing. It is undisputed by both sides that Charles' original lost will split his estate evenly between his six children, including David and Carol. It is also undisputed that the only financially significant asset in Charles' estate at the time of trial was a house, encumbered by a mortgage lien, with an equity value of between $60,000 and $70,000. Upon learning that the will was missing, Charles allegedly told Carol to have her then-boyfriend draft him a new will that he would sign. Carol testified that it was the VA

insurance policy change, not the dispute over Robert's estate, that finally caused Charles to change his will.

Meanwhile, the probate court in Robert's case found that Carol's will contest was not brought in good faith, and over her objection, the will was admitted to probate and David was appointed as executor of Robert's estate. Litigation in that case was ongoing at the time of trial, and the parties in that case recently settled on appeal during the pendency of this action.[3]

### Charles Kam's Alleged New Will

A year after Robert Kam died, Charles Kam met with Carol's then-boyfriend, Jimmy Carter, who was not a lawyer, to type up a new will that disinherited David. Carter testified that he found a form will online that had instructions on how to properly execute a will, and that he filled in and changed provisions based on Charles' wishes.[4] The will named Tommy and Carol as co-executors. It excluded David from inheriting anything, and removed Robert as an heir, ultimately resulting in a four-way split of the estate between the rest of Charles' living children. Carol also submitted a handwritten letter to the trial court, purportedly from Charles Kam addressed to David. According to her, Charles instructed her not to deliver the letter to David until after Charles had died. The letter, which was notarized on April 11, 2012, reads as follows:

---

**2.** The record also contains an affidavit purportedly from Charles Kam in which he states he did not authorize any changes to be made to his VA insurance policy.

**3.** *See In re Estate of Kam*, No. 05–14–00088–CV, 2014 WL 2580555, at *1 (Tex.App.—Dallas June 9, 2014, no pet.)(mem.op.).

**4.** At trial, David, who repairs commercial printers for a living, testified that irregularities with fonts, typefaces, and page margins

suggested to him that the will was actually several documents created at different times and then attached together. When asked about the supposed irregularities, Carter, who prepared the will, testified that they had resulted from the fact that he copied the form will text from his Internet browser and pasted it into his word processor, which automatically altered formatting. He "didn't go back and correct the alignment."

David,

I left you out of my will.

Changing my VA–Policy.

I saw what you did to Justin in keeping him out of his Father's house against Robert [sic] *wishes.*

Robert would have not hired an attorney—& I dont [sic] need to [illegible] the hassel [sic]—I am leaving everything to Tommy for its [illegible]. Tommy, Cindy, Cheri & Carol.

Charles J. Kam

Once the will was prepared, Carol took Charles to a UPS Store in Casa Linda Plaza. While there, Charles signed the will in the presence of notary Mona Eakin. Eakin testified that she checked Charles Kam's identification because the name sounded familiar to her, since there had been a complaint that someone named Kam had not signed a notarized document, and she wanted to make sure the man was who he said he was. Eakin spoke with Charles briefly, determined the document was a will, asked him if he knew what he was signing, and then, after confirming he understood, asked him to place his thumbprint on the will.[5] She then notarized the will.

Shortly thereafter, Carol called her friends Jeanette Collora and Veronica Czikora to her house to serve as attesting witnesses to Charles' will. Neither woman saw Charles actually sign the document, nor did either woman see the other sign the document.

Collora testified that she was not an heir under the will. She signed the will in front of Charles Kam but could not remember the specific date she did so. Although it was Carol who asked her to sign the will and not Charles, Collora insisted that she would not have signed the will if she did not believe Charles did not want this to happen. Collora further testified that she understood the will she was signing excluded David.

Czikora also testified that she went to Carol's house to serve as witness to the will. However, at the time she signed the will, Charles was not in the room with her, and she did not recall where exactly he was. She was not a beneficiary under the will, and did not have a conversation with Charles about the will or its contents. However, Charles Kam had previously told her that he was very disappointed with David, but he did not explain why in detail.

### *Charles' Mental State*

Much of the trial testimony centered around Charles' physical and mental state near the time he purportedly executed his new will.

5. There is a discrepancy in the record over how many pages of the will Charles Kam placed his thumbprint on at Eakin's office. Eakin's notes from her notary notebook state: "I had him thumbprint All pages after he signed them. So there would be no question he was the one signing." [Emphasis in original]. Her trial testimony suggests that she only had Charles place his thumbprint on the signature page:

Q. Okay. Did you—do you do this—when you notarized it, did you look at him and talk to him enough to make an opinion as to whether or not he had his mental faculties such that he knew what he was doing?

A. Well, there was an issue before. Somebody had e-mailed us and said that he didn't notarize something before with somebody else, one of the other notaries in the building. And the name was familiar to me, *so I went an extra step and had him thumbprint his signature* and also talked to him about it.... [Emphasis added].

The will in the record before us contains what appears to be a thumbprint on the second page, underneath Charles Kam's signature. Page one lists heirs and the disposition of the estate, and page three contains the signatures of Jeanette Collora and Veronica Czikora.

Attesting witness Collora testified that she had known Charles her whole life. She described him as a strong-willed person. When she witnessed the will, Charles seemed "just incredibly sad, and so I think he was just sort of surrendering." She testified that she believed Charles was "worn out" from having lost his wife and son within a short period of time, and from the "drama going on amongst his children." In spite of Charles' sad demeanor, Collora believed that on the day she signed the will, Charles was in a mental state to decide for himself, and she would not have signed the will if she believed it was not what Charles actually wanted.

Attesting witness Czikora testified that she saw Charles at Carol's house from time to time, and that she first met Charles when she became friends with Carol in high school. She described Charles as personable, friendly, warm, and strong-willed. She stated that Charles was not easily intimidated, and that "he definitely had opinions . . . he could stand his ground." She further testified that although Charles' physical strength had diminished, Charles still had good mental ability and was "very sharp" around the time he executed the alleged will.

Tom Kam testified that he spoke with his father almost daily. Tom agreed that Charles' physical health was deteriorating, but mentally, Charles was "pretty sharp" until he began being administered medications for pneumonia that he contracted the summer after he signed the alleged will. Tom further testified that Charles had excellent memory, did not suffer from dementia, and understood his financial situation. Tom originally did not think that Charles wanted to exclude David from the will; however, after signing the will, Charles explained to Tom that the new will expressed his wishes. According to Tom, Charles was upset with David and had concerns that David was not managing Robert's estate well or in an honest manner.

David testified that there were no changes in his relationship with Charles as a result of the litigation over Robert's estate and that his father never expressed disappointment to him or told him that he was being written out of the will. David denied changing Charles' VA policy to make him sole beneficiary. David further testified that his father had very good "older memory" but that his "newer memory" was not as good, and that occasionally, his father would be forgetful and would be unable to do things like switch input modes on the television. Charles had suffered a major stroke, as well as several minor strokes, which caused him to "slow[ ] down quite a bit." David agreed that Charles was a strong-minded person, but disagreed that Charles had good mental ability until the summer before he died. David maintained that the siblings would try to hide Charles' keys to keep him from driving, and David recounted an incident where Charles fell down after driving to church. David claimed that shortly before his father died, Charles asked if he could stay with David to get away from Carol, and complained that she had pressured him into signing documents. However, David also admitted that months before when he confronted his father about Carol, Charles said "I can handle Carol."

### Procedural History

On August 20, 2012, almost six months after executing the alleged new will, Charles Kam died. Thereafter, Carol twice attempted to submit Charles' will to probate. The first time, acting *pro se*, she deposited two out of three pages of Charles' will with the clerk, and did not file an application for probate. While at the courthouse, she met an attorney who

agreed to help her with probating Charles' will. Through her counsel, Carol re-filed the complete will and an application for probate.

David intervened and contested the alleged will. Following trial, the lower court issued an order denying Carol's application for probate and made findings of fact and conclusions of law. The trial court also found that Carol did not bring her probate application in good faith and with just cause.

This appeal followed.

## DISCUSSION

In her first two issues, Carol challenges the legal and factual sufficiency of the trial court's findings that Charles' purported will was not validity executed and that the will was the product of her undue influence on him. She also argues that we should overturn the trial court's finding that she did not bring her will application in good faith, which prevents her from collecting attorney's fees. We agree that the trial court's conclusions on validity and undue influence were erroneous, and that the trial court erred in its denying Carol attorney's fees.

## I.

### Standard of Review: Legal and Factual Sufficiency

 In reviewing a legal sufficiency challenge to the trial court's fact findings, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Wells Fargo Bank, N.A. v. HB Regal Parc, L.L.C.,* 383 S.W.3d 253, 260 (Tex.App.—Dallas 2012, no pet.). Where a party challenges a finding rendered in favor of an opposing party that bore the burden of proof, the evidence underpinning that finding is legally insuffi-

cient where: (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). "When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it has the burden of proof, that party can prevail only if it demonstrates that the evidence conclusively establishes all vital facts in support of the issue." *Wells Fargo Bank, N.A.,* 383 S.W.3d at 260. A party who prevails on legal sufficiency grounds is entitled to reversal and rendition of judgment in its favor. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 86 (Tex.1992).

 On factual sufficiency review, "[t]he court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001). "In doing so, the court of appeals must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Id.* [Internal citation and quotation marks omitted].

## II.

### Will Execution

In her first issue, Carol contends that the trial court erred by finding that the alleged will was not properly executed. We agree.

The party offering a will to probate bears the initial burden of proof. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). Because Carol bears the burden here, and because the trial court found insufficient evidence to show proper execution, we may only reverse that finding here if Carol conclusively establishes all facts in support of her claim. *Wells Fargo Bank, N.A.*, 383 S.W.3d at 260. Under TEX.ESTATES CODE ANN. § 251.051 (West 2014),[6] to be valid, a last will and testament must be:

(1) in writing;

(2) signed by:

(A) the testator in person; or

(B) another person on behalf of the testator:

(i) in the testator's presence; and

(ii) under the testator's direction; and

(3) attested by two or more credible witnesses who are at least 14 years of age and who subscribe their names to the will in their own handwriting in the testator's presence.

Where, as here, a non-self-proved will has the proper number of attesting witnesses, it "may be proved by the sworn testimony or affidavit of one or more of the subscribing witnesses to the will taken in open court." Tex.Estates Code Ann. § 256.153(b)(West 2014)[7]; *cf. Henderson v. Barrett*, 376 S.W.2d 432, 433 (Tex.Civ. App.—Waco 1964, writ ref d n.r.e.)(one witness sufficient to establish validity of non-self-proving will).

At trial, Carol offered testimony from subscribing witnesses Veronica Czikora and Jeanette Collora. She also offered testimony from the notary, Mona Eakin. David attacks these witnesses collectively and individually.

First, David maintains that even if the testimony of these witnesses is accepted wholesale, Carol cannot establish that the will was properly attested as a matter of law because none of the subscribing witnesses could describe the will's contents. However, a witness's knowledge of the will's contents is unnecessary to establish the narrow issue of proper attestation and, by extension, proper execution. "[A]ttestation of a will is the act of witnessing the performance of the statutory requirements to a valid execution of the will." *Zaruba v. Schumaker*, 178 S.W.2d 542, 543 (Tex.Civ.App.-Galveston 1944, no writ). "This is done by the witnesses signing their names to the instrument in the presence of the testator." *Davis v. Davis*, 45 S.W.2d 240, 241 (Tex.Civ.App.—Beaumont 1931, no writ). A "credible" witness in this context is one that is competent to testify, and "[a] competent witness to a will is one who receives no pecuniary benefit under its terms." *Triestman v. Kilgore*, 838 S.W.2d 547, 547 (Tex.1992). So long as at least two non-inheriting witnesses attest to the signature, and so long as at least one testifies, the non-self-proving will

---

**6.** Formerly TEX.PROBATE CODE § 59(a). The Texas Estates Code, which repealed and replaced the Texas Probate Code, became effective on January 1, 2014. Acts 2009, 81st Leg., ch. 680, § 1, eff. Jan. 1, 2014. "The new codification is without substantive change, and its purpose is to make the law more accessible and understandable." *In re Estate of Crawford*, No. 06–14–00051–CV, 2014 WL 7140313, at *1 n. 1 (Tex.App.—Texarkana Dec. 16, 2014, no pet.)(mem.op.)[Internal quotation marks omitted]; *see generally* Tex.Estates Code Ann. § 21.001 (West Supp.2015). Although this case arose under the Probate Code, we will reference the current provisions of the Texas Estates Code in this opinion. *See also* TEX.ESTATES CODE ANN. tit. 1, tbl. 1, Editors' Notes (West 2015)(disposition table linking former Probate Code provisions with current Estate Code provisions).

**7.** Formerly TEX.PROBATE CODE § 84(b).

meets the statutory formalities. TEX.ES-TATES CODE ANN. §§ 251.051(3), 256.153(b).

An attesting witness is "simply a witness to the signature of the testator." *Brown*, 210 S.W.3d at 662 [Citation omitted]. The statute does not require the attesting witnesses to see the testator sign the will, so long as "they can attest, from direct or circumstantial facts, that the testator in fact executed the document that they are signing." *Brown v. Traylor*, 210 S.W.3d 648, 661 (Tex.App.—Houston [1st Dist.] 2006, no pet.). "[T]he statute does not require that a will's contents be published to its witnesses." *In re Estate of Arrington*, 365 S.W.3d 463, 467 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Indeed, the Houston First Court of Appeals has gone so far as to suggest that the attesting witnesses do not even need to know the signed document they are witnessing is a will. *Brown*, 210 S.W.3d at 662; *accord Davis*, 45 S.W.2d at 241. David's global objection to the witnesses' testimony on this basis is without merit.

David also attacks each witness individually. He maintains that Carol cannot validly prove up the will's formalities because attesting witness Czikora viewed Charles' purported signature while he was out of the room. Assuming without deciding that Czikora's attestation testimony is insufficient as a matter of law, testimony from one witness is sufficient proof, and here, Carol provided uncontradicted testimony from two other competent subscribing witnesses: Jeanette Collora and Mona Eakin.

Still, David asserts these two witnesses individually provided legally insufficient testimony. He argues that Collora's testimony is insufficient to prove the will because she did not speak with Charles about his will before attesting. Again, a witness generally is not required to know specifics about the will in order to attest, and David cites no authority for the proposition that Collora was required to speak at length with Charles in order to be able to attest to the will. But even absent Collora's testimony, Eakin's testimony alone is sufficient to prove the will. Although David urges us to disregard Eakin's testimony because she signed the will in her capacity as a notary, that fact is of no legal consequence here; a notary can be a subscribing witness even if he or she intended to sign only as a notary. *See In re Estate of Teal*, 135 S.W.3d 87, 91–92 (Tex.App.—Corpus Christi 2002, no pet.)(notary who "spoke to the testator, ascertained that he was of sound mind and body, was aware of the contents of the will[,] and was executing it of his own free will" served as an attesting witness).

"A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822. Here, there is no reasonable disagreement as to what the evidence shows on this narrow legal issue. The testimony of one witness is sufficient to establish execution under these circumstances. The uncontradicted testimony of two witnesses—one of whom who was totally and completely disconnected from the family conflict—conclusively establishes only one reasonable inference: that the formalities and solemnities necessary to execute the will were fulfilled. The trial court's decision could not have rested on that ground.

Issue One is sustained.

## III.

### Undue Influence

Having established that the will was executed with the proper formalities and solemnities, we turn to the alternate basis for judgment. In Issue Two, Carol main-

tains that there is no legally or factually sufficient evidence showing she exerted an undue influence on Charles. David counters that we should uphold the trial court's judgment because circumstantial evidence shows Carol had access to Charles and urged him to change his will to disinherit David. Assuming David's assertions are true, means, motive, and opportunity are not enough to show undue influence as a matter of law. The record must raise a fact issue showing that Carol's influence actually overwhelmed Charles such that his will actually reflected her wishes and not his own. Here, there is insufficient evidence to show that Charles could not make his own, independent decisions as to his estate's disposition.

Because the will has been established, the burden shifts to David, as contestant, to establish that it should be voided as the product of undue influence. To establish undue influence, a contestant must show: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence. *Rothermel*, 369 S.W.2d at 922. "[I]nfluence is not undue unless the free agency of the testator was destroyed and a testament produced that expresses the will of the one exerting the influence." *Rothermel*, 369 S.W.2d at 922. "The circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence." *In re Estate of Steed*, 152 S.W.3d 797, 810 (Tex.App.— Texarkana 2004, pet. denied). "Mere requests or efforts to execute a favorable instrument are not sufficient to establish undue influence unless the requests or efforts are so excessive so as to subvert the will of the maker." *In re Estate of Clifton*, No. 13–11–00462–CV, 2012 WL 3139864, at *2 (Tex.App.—Corpus Christi Aug. 2, 2012, no pet.)(mem.op.).

In *Rothermel*, the Texas Supreme Court laid out a non-exhaustive list of ten factors courts should consider in assessing whether undue influence exists:

(1) the nature and type of relationship existing between the testator, the contestants, and the party accused of exerting such influence;

(2) the opportunities existing for the exertion of the type or deception possessed or employed;

(3) the circumstances surrounding the drafting and execution of the testament;

(4) the existence of a fraudulent motive;

(5) whether there had been a habitual subjection of the testator to the control of another;

(6) the state of the testator's mind at the time of the execution of the testament;

(7) the testator's mental or physical incapacity to resist or the susceptibility of the testator's mind to the type and extent of the influence exerted;

(8) words and acts of the testator;

(9) weakness of mind and body of the testator, whether produced by infirmities of age or by disease or otherwise;

(10) whether the testament executed is unnatural in its terms of disposition of property.

*Rothermel*, 369 S.W.2d at 923; *see also In re Estate of Graham*, 69 S.W.3d 598, 609–10 (Tex.App.—Corpus Christi 2001, no pet.). "The first five factors as elucidated in *Rothermel* and *Graham* address the first element of undue influence (i.e., whether such influence existed and was exerted with respect to the testament at

issue); the next four factors concern the second element (i.e., whether the testator's will was subverted or overpowered by such influence); and the tenth factor is relevant to the third element (i.e., whether the testament would have been executed but for such influence)." *In re Estate of Clifton,* 2012 WL 3139864, at *3.

In support of the trial court's ruling, David points to the following evidence: (1) Charles was of advanced age and had occasional memory problems; (2) Charles had a stroke which physically weakened him; (3) Carol spent a great deal of time with Charles; (4) Collora testified that Charles looked like he was "surrendering" when she witnessed his signature; (5) Carol's accusations about David's actions allegedly had no basis in fact; and (6) the alleged new will makes an unnatural disposition by disinheriting him.

We agree with David that there is legally and factually sufficient evidence showing that Carol probably exerted an influence over Charles' decision-making process, and that but for her entreaties and efforts to have the will made and executed, the new will would probably have not come into existence. However, David has not provided legally or factually sufficient evidence showing the pivotal second step of the analysis: that Carol's efforts actually overwhelmed Charles' free agency.

"Evidence concerning one element is insufficient because each element is necessary to establish a claim of undue influence." *In re Estate of Sidransky,* 420 S.W.3d 90, 95 (Tex.App.—El Paso 2012, pet. denied). Taking David's contentions as true for the sake of argument, they are insufficient to establish that Carol overpowered Charles' ability to decide for himself. We first note that a weakened physical or mental state "is only indicative of . . . susceptibility to influence; it is no evidence that such influence exists in fact."

*Guthrie v. Suiter,* 934 S.W.2d 820, 832 (Tex.1996). Further, although Charles suffered a stroke, and although David testified that Charles was prone to occasional memory problems, there was no evidence Charles suffered from any mental deficiency such that he could not resist any request from Carol. To the contrary, multiple witnesses, including David, described Charles as strong-willed and independent, and multiple witnesses described Charles as mentally "sharp" or "very sharp" until he contracted pneumonia shortly before his death several months after executing the alleged will in this case. The record shows that Charles drove his car regularly, and although he visited Carol fairly frequently, he also lived mostly independently. David himself testified that Charles told him "I can handle Carol."

Likewise, David's exclusion from the will is no evidence of undue influence. "The fact that a testatrix chooses to distribute her estate among a number of children or relatives making one bequest larger than another, or the fact that a testatrix chooses to exclude certain children from a will while providing for others is not in and of itself evidence of undue influence." *In re Estate of Sidransky,* 420 S.W.3d at 99. "A person of sound mind has the right to dispose of his or her property in the manner he or she wishes." *Id.* This principle holds regardless of whether a testator of sound mind's perceptions about the disinherited heir's actions or motivations at the time the testator signs the disinheriting instrument are true or not. *Id.*

As for Collora's testimony that Charles looked sad and like he was "surrendering" when she witnessed his signature, these statements at best create no more than mere surmise and suspicion that Carol overwhelmed Charles' faculties; they are no evidence of undue influence in fact,

particularly given that when directly asked about Charles' mental state that day, Collora admitted that she believed he was capable of making his own decisions at the time. Even under the most generous reading of the record, Collora's statements about her observations of Charles can best be described as equivocal. Charles' demeanor could have indicated that he was surrendering to Carol's wishes. Then again, as Collora admitted, it could simply be that Charles' attitude of "surrender" was simple disappointment with David's actions and the growing acrimony among his children in the waning months of his life. Case law makes clear that this type of equivocal evidence raising only surmise and suspicion will not support a factually sufficient finding of undue influence. *See In re Estate of Steed,* 152 S.W.2d at 810. Indeed, Collora's statements about Charles' demeanor only create mere surmise and suspicion on the issue of undue influence, and such evidence is legally insufficient to support a verdict.

In short, the trial court's conclusion that Charles Kam was unduly influenced into executing the offered will was unsupported by legally or factually sufficient evidence. Its order excluding the will on this basis was in error. Issue Two is sustained.

## IV.

### Good Faith and Just Cause

Finally, we turn to the issue of attorney's fees. In Issue Three, Carol asserts that as coexecutor under Charles' will, she is entitled to reasonable attorney's fees she has accrued in these proceedings under the Texas Estates Code. However, the trial court's finding that she did not act in good faith or with just cause precludes her from collecting these fees.

She maintains that the trial court's findings on this point were legally and factually insufficient, and should not stand as a bar to her collecting attorney's fees.

The Texas Estate Codes provides that:

A person designated as executor in a will or an alleged will ... who, for the purpose of having the will or alleged will admitted to probate ... prosecutes any proceeding in good faith and with just cause, whether or not successful, shall be allowed out of the estate the executor's ... necessary expenses and disbursements in those proceedings, including reasonable attorney's fees.

TEX.ESTATES CODE ANN. § 352.052(a)(West Supp.2015).[8]

"The issue of good faith is a question of fact, to be determined under all the circumstances of the case." *Harkins v. Crews,* 907 S.W.2d 51, 62 (Tex.App.—San Antonio 1995, writ denied). We will uphold the trial court's finding that Carol did not bring the will contest in good faith unless she conclusively establishes her good faith. *See Ray v. McFarland,* 97 S.W.3d 728, 729–30 (Tex.App.—Fort Worth 2003, no pet.)(reversing judgment non obstante veredicto and reinstating jury findings because some evidence supported conclusion that will contest was not brought in good faith). In this context, "good faith" is typically defined as "an action which is prompted by honesty of intention, or a reasonable belief that the action was probably correct." *Ray,* 97 S.W.3d at 730; *see also Matter of Estate of Hanson,* No. 11–13–00113–CV, 2015 WL 1967448, at *9 (Tex.App.—Eastland Apr. 30, 2015, no pet.)(mem.op.). "With just cause" means that the actions "in this proceeding were based on reasonable grounds and there was a fair and honest cause or

---

8. Formerly TEX.PROBATE CODE § 243.

reason for said actions." *Ray,* 97 S.W.3d at 730; *see also Estate of Hanson,* 2015 WL 1967448, at \*9. Because our judgment here will result in the admission of the will to probate, Carol has· conclusively established that her application was brought in good faith and with just cause. She is entitled to attorney's fees. *Cf. Miller v. Anderson,* 651 S.W.2d 726, 728 (Tex. 1983)(good faith and just cause components of attorney's fees analysis "inapplicable" where will is actually admitted to probate).

Issue Three is sustained.

## CONCLUSION

Issues One, Two, and Three ·are sustained. The judgment of the trial court is reversed. We render judgment admitting the offered will to probate and remand for further proceedings in the administration of the estate of Charles Kam. May he rest in peace.