**Opinion issued November 8, 2022**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00019-CV

———————————

**CHERYE ALTICE, Appellant**

**V.**

**KRYSTLE HERNANDEZ, Appellee**

---

**On Appeal from the Probate Court No. 1**
**Harris County, Texas**
**Trial Court Case No. 474669**

---

## O P I N I O N

Appellant, Cherye Altice, filed suit contending that the will of her deceased mother, Theresa Altice, was procured by undue influence, was invalid, or both. After jury disagreed and made findings in favor of Cherye's niece, appellee Krystle Hernandez, the trial court confirmed Krystle as the Independent Executrix of

Theresa's will and ordered that the will, which had previously been admitted to probate, be probated. In four issues, Cherye contends that (1) there was legally and factually insufficient evidence to support the jury's finding that the will met the requisite statutory formalities, (2) the self-proving affidavit attached to the will was defective, (3) there was factually insufficient evidence for the jury to reject Cherye's undue-influence claims, and (4) there was legally and factually insufficient evidence to support the jury's finding that Cherye proffered a purported 1998 Holographic Will in bad faith. We affirm.

## BACKGROUND

### *The Parties, the Properties, the Claims, and the Wills*

Theresa Altice died on March 14, 2019, at the age of 81. Theresa had four children, Andy, Randall, James, and Cherye, and several grandchildren, including Krystle, Randall's daughter. Theresa's estate at death included a home on Scharpe Street in Houston, a home on Kingston Street in Houston, and a home in Wimberley, Texas,[1] as well as stocks, cash accounts, and mineral interests.

---

[1] The evidence shows that Cherye and Randall lived with their mother at the Scharpe Street home while they were growing up. When Krystle was young, she lived in a garage apartment behind the Scharpe Street home with Randall, while Theresa lived in the main house. At some point, Theresa inherited the Kingston Street house in River Oaks from her employer and lived there with her husband, Julio Madrigal. For a few months before her death, Theresa moved back into the Scharpe Street house with Cherye so that Cherye could help care for her.

Theresa left a will dated October 19, 2017, that named her granddaughter, Krystle, as executor and sole beneficiary. Krystle filed an application to probate the will, and, on April 9, 2019, the trial court admitted the will to probate ["the Admitted Will"], ordered that Krystle be named as Independent Executrix, and authorized the issuance of Letters Testamentary to her.

In December 2019, Cherye filed an Opposition and Contest to the Admitted Will. In her live pleading before trial, Cherye claimed that the Admitted Will was (1) a forgery or (2) procured by undue influence. Cherye also offered a holographic will dated March 5, 1998, which she sought to probate as an alternative to the Admitted Will.

In fact, there were three wills in this case: (1) a March 5, 1998 Holographic Will [the "1998 Holographic will"], in which Theresa left "all my world[ly] possessions to my Children Andy Martinez, Randall Martinez, James Martinez, and Cherye Altice," and specifically disinherited a prior husband, Bob Adams; (2) a Holographic Will dated October14, 2017 (the "2017 Holographic Will")—five days before the Admitted Will—in which Theresa expressed her wish "to grant my granddaughter Krystle Elizabeth Martinez my whole estate" and, to "specifically disinherit Julio Perez Madrigal (my husband)"; and (3) the October 19, 2017 Admitted Will, in which Theresa again "specifically disinherit[ed] Julio Perez Madrigal" and stated that "I give, devise and bequeath my entire estate, both real

and personal property, to my grand-daughter, Krystle Martinez." The Admitted Will bears both Theresa's signature and those of two witnesses, Randall and Christian Hernandez.[2]

### *The Trial*

Cherye, as the contestant of a will that had been admitted to probate, was the plaintiff in the case and had the burden of proof. *See Williams v. Hollingsworth*, 568 S.W.2d 130, 132 (Tex. 1978) ("[T]he burden of proof is upon the contestant in a suit to set aside an order admitting a will to probate"). She called six witnesses, whose testimony we summarize below.

#### *Joe Garza—the Notary*

Joe Garza testified that he was a notary in the Spring Branch area of Houston. Randall and Theresa walked in his place of business on October 19, 2017, and asked him to notarize a document. As is his practice, he made copies of their driver's licenses and the document he notarized.  In his records, he had copies of pages 6 and 7 of the Admitted Will, which contained only the self-proving affidavit and the page on which he affixed his notary seal.  He did not recall seeing pages 1 through 5, which included the will itself.  He only notarized Randall's and Theresa's signatures, but he did not notarize Christian's signature, or he would have made a copy of

---

[2]     Christian Hernandez is Krystle's husband, but they were not married in 2017, when he witnessed Theresa's will. Christian and Krystle did not marry until 2020, well after Theresa's death.

Christian's driver's license. Based on his records, he concluded that Christian did not appear before him. Garza testified that he did not type Christian's name on the self-proving affidavit, but he did say that he had a typewriter in his office. He did not recall if he typed Randall's name on the self-proving affidavit.

Garza testified that, sometime later, a man came to his office and asked if he could also sign the document, and Garza told the man that he could not alter a document that he had already notarized. It was his understanding that the man who came by his office was married to one of the parties.

Garza testified that he was comfortable that Theresa was "willingly signing the document" because it was his practice to tell affiants that if they were not comfortable signing, he would not notarize the subject document.

*Christian Hernandez—the Witness*

Christian testified that he was married to Krystle and that Theresa was Krystle's grandmother. But, at the time the will was executed, he and Krystle were not yet married; they did not marry until 2020. On October 19, 2017, Randall and Theresa came by his house and told him that they needed his signature. He recognized the Admitted Will as the document he saw. Christian did not see Theresa sign the Admitted Will, but, when asked how he was sure she signed it, he responded, "By her words." "By her words, you know. They just said they needed my signature and, you know, that they signed and they just needed my signature." Christian

5

testified that he signed the document in his home; he was not at the notary's office and he did not sign either the Admitted Will's attestation clause or the self-proving affidavit in Garza's presence. It was his recollection that when he signed, both his and Randall's typed names were already on the document and he did not know who added the names. When Randall and Theresa asked him to sign, "[Christian] pretty much signed it, scanned through it and signed it." He identified his signature and writing on the Admitted Will. He was sure that the Admitted Will was the document that he signed.

Christian admitted that sometime later, he went to Garza's office to see if the affidavit that Garza had in his possession matched the affidavit attached to the Admitted Will, but he denied asking Garza to alter any document.

*Judith Brokaw—the Attorney*

Brokaw was Theresa's attorney and had worked on a debt-collection matter with her before the events of this case. At some point, Theresa asked Brokaw to prepare a will for her. The only thing that Brokaw remembered discussing with Theresa about the will was Theresa's desire to disinherit her husband, Julio Madrigal. Brokaw's billing records show that she charged Theresa $300 for the preparation of a will. She did not recall the will, but she acknowledged that there was documentation that her office sent out a draft of Theresa's will for her review and that the draft will "looks like something [she] would have prepared." In the letter

6

accompanying the draft will, Brokaw told Theresa to call and schedule an appointment to come by and execute the will. She advised bringing a friend as a witness, warning Theresa that there would be a $150 charge if she did not.

` Brokaw did not remember ever having the will executed in her office or meeting Randall or Christian or Garza, the notary. Brokaw testified that it was not her standard practice to provide a notary or a witness for a will that she drafted. Brokaw testified that she did have a typewriter, but she did not believe that her office had typed in Christian's and Randall's names on the self-proving affidavit.

Regarding a description of her office, Brokaw testified that she had Chinese sculptures and Asian art in her reception area, but she did not have a glass conference room.

Brokaw testified that she would never draft a will based on instructions received from family members or someone other than the testator because "a will is a very personal thing." She stated that if there were misspellings in a will, she would have corrected them before the will was executed.

*Randall Martinez—The Witness/Son*

Randall testified that he was Theresa's second son and that he lived down the block from the Scharpe Street house where he grew up and where Cherye currently resided. For a while he lived in Theresa's garage apartment while he was raising his children, including Krystle. He testified that Theresa loved all of her children "in her

7

own way." Randall said that his mother was not "meek and mild" and she "did what she wanted when she wanted." He said that Theresa "helped with [Cherye's] children, gave her a lot of money, paid her bills when she couldn't pay them, dealt with her boyfriends, let them move in. . . . all the time she was supporting them."

On October 19, 2017, Theresa called him and asked him to drive her to a lawyer's office. Randall then drove Theresa to Brokaw's office, where he and Theresa signed the Admitted Will. Only three people were present at the time—Randall, Theresa, and Brokaw. Brokaw did not have a notary in her office. Christian was not at Brokaw's office and did not sign the will then. Randall testified that he remembered that Brokaw's office had cherry wood Asian sculptures in the shape of dragons. He thought he remembered a glass conference room, but he might have been mistaken.

From Brokaw's office, Randall and Theresa drove to a notary's place of business. He and Theresa gave Garza, the notary, their driver's licenses, and both signed the self-proving affidavit, having already signed the will at Brokaw's office. At some point, Garza mentioned that Theresa needed a second witness. Randall and Theresa asked whether they should go get someone, but Garza said that they should pick whom they wanted and that he would put that person's name on the affidavit. Then, they could have Christian sign it and send the copy back to Garza. The document was never mailed to Garza after Christian later signed it. Randall did not

see his and Christian's names being typed on the self-proving affidavit. He did not have a typewriter, but he noticed that Garza had a typewriter.

From Garza's place of business, Randall and Theresa drove to Christian's house and asked him to sign the will and self-proving affidavit, which Christian did in both his and Theresa's presence.

Randall also testified about a Holographic Will dated October 14, 2017—five days before the Admitted Will was signed. This will also left everything to Krystle and disinherited Theresa's husband, Julio. Randall testified that he had discussed his mother's will with her before this date and that she had told him, "Randall, what am I going to do about my will? I can't leave anything to Julio. I don't like him. All my kids . . . are pieces of . . . and they've all disappointed me. They don't deserve anything. I want to give it all to charity. . . . [a]ll y'all have done is disappoint[] me. Cherye takes my money, Andy takes my money . . . Randall, you're the only one that didn't cause me any problems." Randall said that he encouraged Theresa to give all her money to St. Jude's. According to Randall, "[T]heresa never intended for her children to have it because we'd all disappointed her, and some of them have taken advantage of her for years and years and years."

Randall testified that, once the Admitted Will was probated, Krystle was going to sign over the Scharpe Street house to Cherye, where Cherye was currently living. Krystle was also going to give Cherye a car and some money because "[t]hat

was [Theresa's] wishes" in consideration for Cherye having taken care of Theresa for the last few months of her life.

After the Admitted Will was signed and notarized, it was placed in an envelope and left with Krystle.

Randall testified that he was artistically talented, and several of his drawings were admitted into evidence. He denied being able to forge signatures.

*Krystle Hernandez—the Granddaughter/Beneficiary*

Krystle testified about a 2017 Holographic Will that Theresa drafted and signed at her house just five days before she executed the Admitted Will. Theresa wrote the 2017 Holographic Will in one of Krystle's school notebooks and left it with Krystle. Prior to the drafting of the 2017 Holographic Will, Brokaw, at Theresa's request, send a draft of a will to Krystle's home. The draft will, the 2017 Holographic Will, and the Admitted Will all left Theresa's estate to Krystle. Theresa did not want any of the will documents in her home because she was afraid her husband would find out that she was disinheriting him.

Several months before either the 2017 Holographic Will or the Admitted Will were signed, Krystle had begun helping Theresa draft a will and she wrote in her notebook, "I, Theresa Altice, wish for Krystle . . . ." Krystle testified that she stopped because she "just felt it was inappropriate for me to write that for her; and I didn't even know if that would be legally valid either. So I didn't finish it." Krystle said

that she "thought that was something that [Theresa] needed to do in [her] own handwriting . . . [i]t was going to be her will." Two months later, in fact, Theresa employed Brokaw to draft a will for her.

Regarding her grandmother's personality, Krystle testified that Theresa "was very strong-willed." "She was feisty, fierce, very determined, just did what she wanted when she wanted." "Nobody could tell her anything." "She was just very strong-willed." Krystle grew up in the garage apartment behind Theresa's house and they had a "great relationship." Theresa was like a mother to Krystle, who did not have a relationship with her own mother. After Krystle moved out to go to college, she only saw Theresa "every now and then."

When asked about the fact that Theresa signed her middle name as "Meschell" on the Admitted Will and "Mechell" on the self-proving affidavit, she speculated that Theresa signed the Admitted Will so that it matched what way it had been typed on the both documents, which was apparently a misspelling. She pointed out that her own name was spelled two different ways in the Admitted Will.

*Cherye Altice—the Daughter/Contestant*

When asked to describe her mother, Cherye said Theresa was "funny and strong-willed." Theresa was 81 when she died; she had been married four times. Cherye said that Theresa's relationship with her kids had "ups and downs, but . . . she loved us all." Cherye said that she lived with Theresa "off and on my whole

11

life." In 2017—the time during which the Admitted Will was created—Theresa spent lots of time with Cherye's family. "She was always there." Theresa was also close to her other grandchildren. She was not dependent on Krystle or Randall for anything. Cherye had "no knowledge of any time that Randall ha[d] ever influenced [Theresa] to do something she did not otherwise want to do."

Cherye testified that she also had a good relationship with Krystle while she was growing up. She said that she did not file the will contest because of any "ill feeling towards Krystle."

Cherye said that she had discussed will planning with her mother, and that she had given Theresa a Powerpoint packet that she had gotten at work so that Theresa would be knowledgeable. She did not tell Theresa what she should do regarding her will.

At some point, Cherye had a discussion with Theresa that led Cherye to confront Randall about Theresa's estate planning. Cherye felt that something was bothering her mother and that "[t]here was a document out there that she didn't agree to." Cherye understood that Krystle had the only copy of the document that she believed that Theresa was upset about.

During the pendency of the will contest, Cherye was asked to gather documents that exemplified Theresa's handwriting. In November 2020, she found a handwritten will dated March 5, 1998. In this 1998 Holographic Will, Theresa

stated that she wished to "leave all my world[ly] possessions to my children Andy Martinez, Randall Martinez, James Martinez and Cherye Altice." The same document disinherited Bob Adams, her husband at that time. Cherye testified that she recognized the handwriting on the 1998 Holographic Will as her mother's. Cherye believed that until Theresa's death, "it remain[ed] her mother's wishes that her children inherit from her." Cherye also acknowledged that the 1998 Holographic Will was written before Theresa inherited the estate of her employer, which included a home in River Oaks.

Cherye was Theresa's caregiver during the last months of her life, and Theresa moved back into the Scharpe Street home with her.

Cherye could think of no reason why Krystle "would receive something [from Theresa] to the exclusion of [her other children and grandchildren]." She also did not believe that the signature on page 4 of the Admitted Will was Theresa's. She pointed out that Theresa's middle name was misspelled on the signature to the will and the last name "looks different."

In addition to believing that Theresa's signature was a forgery, she testified that Theresa would not have left everything to Krystle absent "an instance of undue influence." However, Cherye conceded that her mother did not lack the mental capacity to make a will and that Theresa was of sound mind in 2017. Cherye did not know what Theresa told Brokaw about what she wanted in her will. Cherye also

testified that her mother liked to pay her bills in person. When presented with a check to Brokaw dated October 19, 2017, Cherye admitted that it was "more than likely" that Theresa went to Brokaw's office on that date, which is the same date that Randall said that they signed the Admitted Will there.

Cherye testified that she did not believe that Randall and Theresa ever took the Admitted Will to the notary. She contended "[t]hat what was taken to the notary was just some piece of paper, that it wasn't even a real will" and that "the notary allowed [Randall] to sign for Christian."

Finally, Cherye affirmed that she "proceeded in this contest with good faith and just cause."

*Susan Abbey—the handwriting expert*

Krystle called just one witness at trial, Susan Abbey, a forensic document examiner. Abbey testified that, after comparing many handwriting exemplars from Theresa, it was her expert opinion that both the 2017 Holographic Will and the 2017 Admitted Will were signed by Theresa.[3]

**The Jury Verdict and Judgment**

After a jury trial, the jury found against Cherye on (1) the issue of undue influence and (2) the invalidity of the will. The jury also found that Cherye did not

---

[3] Cherye did not discover the 1998 Holographic Will until shortly before trial, and Abbey was never asked to opine about the authenticity of Theresa's signature on that document.

act in good faith and with just cause in prosecuting the 1998 Holographic Will, but that Krystle did act in good faith and with just cause in defending the Admitted Will.

Accordingly, the trial court entered a Final Judgment, which ordered that (1) "The October 19, 2017 Will of Theresa Altice, previously admitted to probate, remains admitted to probate," and that (2) "Krystle Hernandez (nee Martinez) remains the Independent Executor of the Estate of Theresa Altice, and is entitled to administer and distribute the Estate in conformance with the October 19, 2017 Will."

This appeal followed.

## SUFFIENCY OF THE EVIDENCE

In issues one and two, Cherye contends that (1) the evidence is legally and factually insufficient to support the jury's answer to jury question number two, in which it found that the October 19, 2017 Admitted Will met the statutory requirements for a valid will, because, among other reasons asserted by Cherye, (2) the self-proving affidavit attached to the will was defective. In issue three, Cherye contents that the evidence is factually insufficient evidence to support the jury's rejection of her undue-influence claim in jury question number one. Finally, in issue four, Cherye contends that the evidence is legally and factually insufficient to support the jury's finding in jury question number five that she did not proffer the March 5, 1998 Holographic Will in good faith.

*Jury Question 2—Validity of the October 19, 2017 Admitted Will*

Question 2 of the Jury Charge asked: "Does the document dated October 19, 2017 (Exhibit C-4) fail to meet any one or more of the following requirements?"

1. The document was signed by Theresa Altice in person; or

2. The document was attested by two or more credible persons who were at least fourteen years of age and who signed their names to the document in their own handwriting in the decedent's presence; or

3. Theresa Altice signed the document with the intent to dispose of her property after her death.

Thereafter, the question instructed the jury that "[a] self-proving affidavit is not part of a will. A self-proving affidavit is a separate document, the sole purpose of which is evidentiary."

Finally, Question 2 instructed the jury about forgery, as follows:

"Forgery" means to alter, make, complete, execute, or authenticate any writing so that it purports:

(i) to be the act of another who did not authorize that act;

(ii) to have been executed at a time or place or in a numbered sequence other than was in fact the case;

(iii) to be a copy of an original when no such original existed.

The jury answered Question 2: "No."

In her first and second issues, Cherye contends that the evidence is legally and factually insufficient to support the jury's negative answer to Question 2 of the Jury Charge; a question on which Cherye had the burden of proof. *See Williams*, 568

16

S.W.2d at 132 (holding that, after will admitted to probate, contestant bears burden to show invalidity).

*Standard of Review*

When, as here, a party challenges both the legal and factual sufficiency of the evidence, appellate courts should decide the legal sufficiency issues first. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 369 (1960)); *see* TEX. R. APP. P. 43.3*; Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (concluding that appellate courts must first address points that afford greatest relief, that Rule 43.3 "incorporates this principle," and that court "erred by not deciding the rendition issue before the remand issue").

To analyze a legal sufficiency challenge, we must determine whether the evidence presented would enable reasonable and fair-minded people to make the finding under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the finding, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 821–22, 827. If conflicting evidence can be resolved either way, we must presume the factfinder did so in favor of the prevailing party and disregard the conflicting evidence. *Id.* at 821. When an

17

appellant attacks the legal sufficiency of an adverse finding on an issue for which the appellant bore the burden of proof, the appellant "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

When reviewing a factual sufficiency challenge, we "must consider and weigh all of the evidence," not just the evidence that supports the trial court's finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); see also Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We must review the evidence in a neutral light. *Woods v. Kenner*, 501 S.W.3d 185, 196 (Tex. App.—Houston [1st Dist.] 2016, no pet.). When a party attacks the factual sufficiency of an adverse finding on an issue for which it had the burden of proof, it must demonstrate on appeal "that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242 (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)).

Under either standard, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *In re Estate of Scott*, 601 S.W.3d 77, 88 (Tex. App.—El Paso 2020, no pet.).

*Applicable Law*

With exceptions not applicable here, a valid will must be (1) in writing, (2) signed by the testator in person or by another person on behalf of the testator in the testator's presence and under the testator's direction, and (3) attested to by two or more credible witnesses who are at least 14 years of age and who subscribe their names to the will in their own handwriting in the testator's presence. TEX. EST. CODE § 251.051.

*Analysis*

It is undisputed that the Admitted Will was in writing, thus the first element for a valid will is both uncontested and met.

Regarding the second element—Theresa's signing of the will—Randall testified that he and his mother, Theresa, signed the will in Brokaw's office and that he saw Theresa sign the will. According to Randall "[they] were standing side by side" when Theresa signed the Admitted Will. Christian testified that he did not actually see Theresa sign the Admitted Will, but that Randall and Theresa came to his house, presented it to him, and asked him to sign. When asked how he "was sure that [Theresa] actually signed this document," Christian responded, "By her words." When asked what Theresa said to him regarding her signature on the Admitted Will, Christian said "that [Randall and Theresa] signed, they just needed my signature." *See Brown v. Traylor*, 210 S.W.3d 648, 661 (Tex. App.—Houston [1st Dist.] 2006,

19

no pet.) ("The witness[] need not see the testator sign the will, as long as [he] can attest, from direct or circumstantial facts, that the testator in fact executed the document [he] is signing."). Thus, Randall's and Christian's testimony is legally sufficient to show that Theresa signed the Admitted Will.[4]

Nevertheless, Cherye argues that this evidence is factually insufficient because (1) Theresa did not initial the document on each page and (2) it was not signed in *both* Randall's and Christian's presence. Cherye points out that the Admitted Will itself states that "the [will] was signed [in Randall's and Christian's presence] by Theresa Meschell Altice and declared by her to be her last will." She also points out that the will states that "I, Theresa Meschell Altice hereby sign my name to this, my last Will, on each page of which I have placed my initials, on this 19th day of October, 2017, at Houston, Texas. These contradictions between recitations in the Admitted Will and Randall's testimony about the signing of the Admitted Will, Cherye contends, renders the evidence regarding Theresa's signing of the Admitted Will factually insufficient. We disagree.

First, there is no requirement that a will be initialed on each page. Indeed, this Court has held that evidence that a will that was *only* initialed on each page but was not signed by the testator, either at the end of the will or on the self-proving affidavit,

---

[4]    Though she argued at trial the Theresa's signature on the Admitted Will was a forgery, Cherye does not make that argument on appeal.

20

was sufficient. *See Jones v. Jones*, No. 01-20-00073-CV, 2022 WL 904444 (Tex. App.—Houston [1st Dist.] Mar. 29, 2022, no pet.) (holding that testimony by witnesses who saw testator sign will constituted legally and factually sufficient evidence of testamentary intent, even though testator only initialed 6 of 7 pages of will and did not sign at all). Here, the witnesses testified that Theresa signed the Admitted Will, and the Admitted Will is, in fact, signed. That the document itself refers to Theresa also initialing the Admitted Will, which she did not do, does not render the remaining evidence insufficient, but was just one fact for the jury to consider in determining whether Theresa signed the Admitted Will.

Second, as mentioned above, there is no requirement that the witnesses actually see the testator sign the will; the requirement is that the testator see the witnesses sign the document. *See* TEX. EST. CODE § 251.051(3) (requiring that witnesses "subscribe their names to the will in their own handwriting in the testator's presence"); *see also Brown*, 210 S.W.3d at 661 ("The witness[] need not see the testator sign the will, as long as [he] can attest, from direct or circumstantial facts, that the testator in fact executed the document [he] is signing"). Here, there was both direct and circumstantial facts from which Christian, as well as Randall, could have concluded that Theresa signed the Admitted Will. Teresa, "by her words," told Christian that she had signed the Admitted Will and she needed him to sign too. Christian testified that he "scanned through it" and signed it, as Theresa had

21

requested. That the document itself states that Theresa signed it in the presence of both witnesses, which both Randall and Christian admit that she did not do, does not alone render the remaining evidence insufficient, but was just one fact for the jury to consider in determining whether Theresa properly signed the Admitted Will.

Regarding the third element—attestation to the Admitted Will by Randall and Christian, both Randall and Christian testified that they signed the Admitted Will in front of Theresa, thereby rendering the evidence legally sufficient. *See* TEX. EST. CODE § 251.051(3) (requiring that witnesses "subscribe their names to the will in their own handwriting in the testator's presence"). Nevertheless, Cherye contends that the evidence is factually insufficient because Christian did not sign Admitted Will or the self-proving affidavit at the same time that Randall and Teresa signed those documents.

We have already noted that there was no requirement that Christian actually see Theresa sign the Admitted Will or that he sign it contemporaneously. *See Brown*, 210 S.W.3d at 661 ("The witness[] need not see the testator sign the will, as long as [he] can attest, from direct or circumstantial facts, that the testator in fact executed the document [he] is signing").

Regarding the self-proving affidavit, Krystle acknowledges that the self-proving affidavit attached to the Admitted Will is defective because both parties agree that Christian did not sign the self-proving affidavit before the notary, Garza.

22

*See* TEX. EST. CODE § 251.104(b) ("A self-proving affidavit must be made by the testator *and the attesting witnesses* before an officer authorized to administer oaths.") (emphasis added)). However, it is not necessary that a will be self-proving; a self-proving will merely allows a proponent of a will to admit it to probate without calling any subscribing witnesses. *See id.* § 251.102(a)(1) ("A self-proved will may be admitted to probate without the testimony of any subscribing witnesses if . . . the testator and witnesses execute a self-proving affidavit."). The jury was instructed that a self-proving affidavit is not required and is evidentiary only. A defect in a self-proving affidavit does not make a will invalid because the affidavit is not part of the will; it just means that the will's proper execution must be proved by other means. *See* Michol O'Connor, O'CONNOR'S PROBATE LAW HANDBOOK, ch. 4-A, § 4 (2022–2023 ed.). When an attested will is not self-proved, the will "may be proved by the sworn testimony or affidavit of one or more of the subscribing witnesses to the will taken in open court." TEX. EST. CODE §256.153(b); *see also Jones*, 649 S.W.3d at 588.

Here, both Randall and Christian testified regarding their attestation to Theresa's will, therefore, any defects in the self-proving affidavit are irrelevant. And, both Randall and Christian testified that they signed the Admitted Will in Theresa's presence, thus meeting the attestation requirement of section 251.051. *See*

23

TEX. EST. CODE § 251.051(3) (requiring that witnesses "subscribe their names to the will in their own handwriting in the testator's presence").

Here, in her legal-sufficiency challenge, it was Cherye's burden to show "all vital facts" necessary to prove the invalidity of the Admitted Will. *Dow Chem.*, 46 S.W.3d at 241. In her factual-sufficiency challenge, it was Cherye's burden to show that the jury's failure to find that the will was invalid was against the great weight and preponderance of the evidence. *See id.* at 242. For the reasons discussed above, she has failed to show either.

Accordingly, we overrule issues one and two.

***Jury Question 1—Undue Influence***

Question 1 of the trial court's charge asked: "Did Theresa Altice, (the decedent in this case) sign the document dated October 19, 2017 (exhibit c-4) as a result of undue influence?" The question provided the following instruction:

"[U]ndue influence" means:

1. an influence existed and was exerted, and

2. the influence undermined or overpowered the mind of the decedent at the time she signed the document dated October 19, 2017 (Exhibit C-4), and

3. the decedent would not have signed the document dated October 19, 2017 (Ex. C-4) but for the influence.

You may also consider the circumstances surrounding the execution of the instrument; the relationship of the decedent and recipients of the bounty; and the motive, character and conduct of the persons benefited.

24

The jury answered Question 1: "No."

In issue three, Cherye contends that the evidence is factually insufficient to support the jury's negative answer to Question 1 of the Jury Charge; a question on which she had the burden of proof. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963) ("The burden of proving undue influence is upon the party contesting its execution.").

*Standard of Review*

When reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Ellis*, 971 S.W.2d at 406–07; *Cain*, 709 S.W.2d at 176. When a party attacks the factual sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. We are not a factfinder. *Ellis*, 971 S.W.2d at 407. Accordingly, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Id.*

*Applicable Law*

To show undue influence, a contestant must prove: (1) the existence and exertion of an influence (2) that subverted or overpowered the testator's mind when she executed the will, (3) such that she executed a will that she would not have

25

otherwise executed but for the influence. *Rothermel*, 369 S.W.2d at 922. Not every influence is an undue influence. *Id.* Indeed, "one may request or even importune and entreat another to execute a favorable dispositive instrument; but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker," there is no undue influence. *Id.*

The presence of undue influence "is usually a subtle thing and by its very nature usually involves an extended course of dealings and circumstances[,]" and it may be proved by circumstantial evidence. *Id.* The circumstances relied on as establishing undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of such influence. *In re Kam*, 484 S.W.3d 642, 652 (Tex. App.—El Paso 2016, pet. denied).

We may consider ten non-exhaustive factors when determining whether undue influence exists. *See Rothermel*, 369 S.W.2d at 923. The first five factors concern whether the proponent exerted any influence over the testator, considering:

(1) the nature and type of relationship between the testator, contestant, and proponent;

(2) the opportunities existing for the exertion of the type of influence or deception possessed or employed;

(3) the circumstances surrounding the drafting and execution of the will;

(4) the existence of a fraudulent motive;

(5) whether there has been habitual subjection of the testator to the control of another.

*Rothermel*, 369 S.W.2d at 923; *Kam*, 484 S.W.3d at 652. The next four factors are used to determine whether the testator's will was subverted or overpowered by any influence exerted by the proponent, considering:

(6) the state of the testator's mind at the time he executed the will;

(7) the testator's mental or physical incapacity to resist such influence or the susceptibility of the testator's mind to the type and extent of influence exerted;

(8) the words and acts of the testator;

(9) the testator's weakness of mind and body, whether a result of age, disease, or otherwise.

*Rothermel*, 369 S.W.2d at 923; *Kam*, 484 S.W.3d at 652. Finally, the tenth factor is relevant to determining whether the will would have been executed in the absence of the influence exerted by the proponent, considering:

(10) whether the will executed is unnatural in its disposition of the testator's property.

*Rothermel*, 369 S.W.2d at 923; *Kam*, 484 S.W.3d at 652.

*Analysis*

We begin by considering the first five *Rothermel* factors, which address whether there is factually sufficient evidence to show that an influence existed and was exerted against Theresa.

27

1. The nature and type of relationship between the testator, contestant, and proponent

Under this factor, Cherye points out that she had a much closer relationship with Theresa than Krystle had. Specifically, Cherye recounts Krystle's testimony, in which she claimed that "at one time she and [Theresa] were close; but after Krystle turned 20 and moved out of [Theresa's] apartment, she only saw [Theresa] one to two times per month." In contrast, Cherye argues that she and Theresa "saw or spoke to each other every day for the past 25 years; that [she] had moved in with [Theresa] to help take care of her when her health began failing; that [she] did everything for [Theresa] wrote her checks, drove her around to pay her bills, took her to her doctor's appointment."

However, this evidence does not show that Krystle (or Randall) had any influence over Theresa. Instead, it shows that, if anyone had opportunity to exert influence over Theresa, it was Cherye, not Krystle. Thus, this factor weighs against finding that Krystle had influence over Theresa.

2. The opportunities existing for the exertion of the type of deception possessed or employed

Under this factor, Cherye argues that Krystle had opportunities to deceive Theresa because (1) Krystle grew up in Theresa's garage apartment "at least half her life," (2) Krystle had in her possession a holographic will dated October 14, 2017—five days before the Admitted Will was executed, (3) the lawyer sent drafts of the

28

Admitted Will to Krystle's home, (4) there is insufficient evidence that Christian signed the Admitted Will in Theresa's presence, and (5) Krystle and Randall "had ample opportunity to make changes to the draft will and present them to [Theresa] as coming from her attorney, Brokaw."

All this evidence was countered by other evidence presented at trial. Specifically, (1) Cherye agrees that Krystle had little contact with Theresa after she moved out of the garage apartment; (2) Krystle explained that Theresa came to her house and signed the 2017 Holographic Will because she had not yet executed the Admitted Will; she asked Krystle to keep it at her house because she did not trust her husband, Julio; (3) Krystle testified that she never gave Brokaw her address, and that Brokaw sent the Admitted Will to Krystle's house because that is where Theresa told her to send it; (4) both Christian and Randall testified that Christian signed the Admitted Will in Theresa's presence; and (5) the jury was not presented with any evidence regarding changes between the Admitted Will and any earlier drafts.

### 3. The circumstances surrounding the drafting and execution of the will

Much of Cherye's undue-influence claim is based on the circumstances surrounding the drafting and execution of the Admitted Will.  Specifically, Cherye argues that there are many unanswered questions surrounding the Admitted Will's drafting and execution, including: "Why was it not sent to [Theresa] at her own home?" "Why did [Theresa] not execute [the Admitted Will] when she allegedly

went to Brokaw's office? "Why instead did [Randall] take her to [the notary's] office to have her signature notarized by a stranger who would not question [Theresa]?" Why did Christian not appear before the notary? Why was Theresa's middle name misspelled on the Admitted Will? Why did Krystle begin drafting a Holographic Will on January 22, 2017, and why was it never completed?

Many of these issues were, in fact, explored before the jury. Krystle testified that Brokaw sent the draft will to Krystle's home because Theresa gave her Krystle's address. Krystle testified that Theresa did not want her will at her home because she did not want her husband to see it. Although Brokaw did not recall Theresa and Randall signing the Admitted Will in her office, Randall testified that both he and Theresa signed it there, but then left to find a notary and second witness because Brokaw did not have one available at her office. Randall testified that Christian did not go with him and Theresa to the notary because they did not know that he needed to. He also testified that the notary told them to take it and have Christian sign it and then send it back to him. There was evidence that Theresa never signed her middle (maiden) name, and none of the handwriting exemplars show how she signs her middle name, though the parties seem to agree that the correct spelling would have been "Meshell," not "Meschell." Whether she signed an incorrect spelling on the Admitted Will so that it would match the document as drafted was considered by the jury. But, the handwriting expert agreed that both the signature on the Admitted

Will, which was "Meschell," and the signature on the self-proving affidavit, which was "Meshell," were both written by Theresa. Regarding the one-line attempt at a holographic will, Krystle testified that she began writing a will at Theresa's request, but that she stopped when she decided that this was something that Theresa needed to do herself. And, in fact, Theresa thereafter engaged Brokaw to draft a will.

### 4. The existence of a fraudulent motive

Under this factor, in addition to the circumstances of the execution discussed above, Cherye asserts that Krystle's fraudulent motive was to obtain Theresa's entire, substantially sized estate, to the exclusion of Theresa's children and other grandchildren. However, the fact that Theresa excluded most of her family members, including her children and other grandchildren, "is not in and of itself evidence of undue influence." *See Kam*, 484 S.W.3d at 653 (quoting *In re Estate of Sidransky*, 420 S.W.3d 90, 99 (Tex. App.—El Paso 2012, pet. denied)); *see also Rothermel*, 369 S.W.2d at 923–24 (noting that situation in which testator prefers one close relative over another "is frequently present in cases involving the issue of undue influence, and it is only where all reasonable explanation in affection for the devise is lacking that the trier of facts may take this circumstance as a badge of disorder or lapsed mentality or of its subjugation").

5. Whether there had been a habitual subjugation of the testator to the control of another

Cherye concedes that "[t]here was no evidence from either party on this factor."

In sum, considering the five factors relating to whether Krystle (or Randall) exerted any influence over Theresa, the jury's finding that no such influence existed is not against the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242. Having decided that there was factually sufficient evidence to support the jury's negative finding on the existence of an influence against Theresa, we need not address the remaining *Rothermel* factors regarding whether such influence subverted or overpowered Theresa's will or whether the Admitted Will, as executed, is unnatural in its disposition of Theresa's property.[5]

We overrule issue three.

---

[5] Even if we were to consider the remaining *Rothermel* factors, our decision would remain unchanged. Randall testified that "[Theresa] did what she wanted when she wanted." "No one controlled her." Krystle testified that Theresa "was feisty, fierce, very determined, just did what she wanted when she wanted." Cherye testified that Theresa "was funny and strong-willed." There was also evidence that Theresa had previously threatened to disown her children and leave her entire estate to charity. The notary testified that he was "comfortable that [Theresa] was willingly signing the document." The attorney testified that the wills she drafted were always prepared according to the testator's wishes because "a will is a very personal thing." Although Cherye's brief suggests that Theresa may have been "paranoid" at the time she wrote her will, the only evidence about her mental condition was that she was afraid of her husband, a convicted sex-offender. No evidence suggested any mental weakness on Theresa's part. And, we have already stated that Theresa's desire to exclude her children from her will is not in and of itself evidence of undue influence. *See Kam*, 484 S.W.3d at 653.

*Jury Question 5—Cherye's Bad Faith*

Question 5 of the trial court's charge asked: "Did Cherye Altice act in good faith and with just cause, whether or not successful, in prosecuting the holographic (handwritten) will dated March 5, 1998 (Exhibit C-19) with the intention of admitting it to probate?" The question provided the following instructions:

> "[G]ood faith" means an action that is prompted by honesty of intention or a reasonable belief that the action was probably cored.

> "With just cause" means that the actions were based on reasonable grounds and there was a fair and honest cause or reason for the actions.

The jury answered Question 5: "No."

In issue four, Cherye contends the evidence is legally insufficient to support the jury's negative answer to Question 5 of the Jury Charge; a question on which she had the burden of proof. *See* TEX. EST. CODE § 352.052(b) (providing that will proponent may seek reasonable attorney's fees from estate for proceeding brought in "good faith and with just cause whether or not successful"); *see also Estate of Lynch*, 350 S.W.3d 130, 140–41 (Tex. App.—San Antonio 2011, pet. denied) (finding sufficient evidence to support jury's rejection of will proponent's asserted good faith).

*Standard of Review*

To analyze a legal-sufficiency challenge, we must determine whether the evidence presented would enable reasonable and fair-minded people to make the

33

finding under review. *City of Keller*, 168 S.W.3d at 827. We review the evidence in the light most favorable to the finding, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 821–22, 827. If conflicting evidence can be resolved either way, we must presume the factfinder did so in favor of the prevailing party and disregard the conflicting evidence. *Id.* at 821. When an appellant attacks the legal sufficiency of an adverse finding on an issue for which the appellant bore the burden of proof, the appellant "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co.*, 46 S.W.3d at 241. The trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *See Golden Eagle Archery*, 116 S.W.3d at 761; *Scott*, 601 S.W.3d at 88.

*Applicable Law*

Section 352.052 of the Estates Codes sets forth the law regarding attorney's fees in will contests:

> (a) A person designated as executor in a will or an alleged will, or as administrator with the will or alleged will annexed, who, for the purpose of having the will or alleged will admitted to probate, defends the will or alleged will or prosecutes any proceeding in good faith and with just cause, whether or not successful, shall be allowed out of the estate the executor's or administrator's necessary expenses and disbursements in those proceedings, including reasonable attorney's fees.

34

(b) A person designated as a devisee in or beneficiary of a will or an alleged will who, for the purpose of having the will or alleged will admitted to probate, defends the will or alleged will or prosecutes any proceeding in good faith and with just cause, whether or not successful, may be allowed out of the estate the person's necessary expenses and disbursements in those proceedings, including reasonable attorney's fees.

TEX. EST. CODE § 352.052(a)-(b). In sum, the trial court shall award attorney's fees to executors, and may award attorney's fees to devisees or beneficiaries, attempting to admit as will to probate or to defend a will. *See id.* However, a party who seeks only to contest a will may not obtain statutory reimbursement for attorney's fees. *See Zapalac v. Cain*, 39 S.W.3d 414, 419 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (interpreting previous version of section 352.052(b)).

Whether a will proponent acts in good faith and with just cause in prosecuting or defending a will is a question of fact, to be determined by the jury upon a consideration of all the circumstances of a case. *See Huff v. Huff*, 132 Tex. 540, 124 S.W.2d 327, 330 (1939); *see also Russell v. Moeling*, 526 S.W.2d 533, 536 (Tex. 1975) (recognizing that question of whether will proponent acted in good faith and with just cause is question for jury that should be determined in original probate proceeding); *Kam*, 484 S.W.3d at 654 (recognizing that good faith is question of fact and that appellate court should uphold jury finding unless evidence conclusively establishes party's good faith).

35

*Analysis*

Very little evidence was presented at trial about the 1998 Holographic Will. Cherye testified that she found this will long after the current will contest was filed when she was looking for exemplars of Theresa's handwriting, and she believed that, because the 1998 Holographic Will left everything to her children, it was her belief that this remained Theresa's intent until the day she died. Cherye also testified that she sought to admit the 1998 Holographic Will to probate in good faith. She contends that, because there is no direct evidence rebutting her testimony, the evidence is legally insufficient to support the jury's rejection of her professed good faith.

However, the jury heard other evidence which might have led to its conclusion that Cherye did not act in good faith in proffering the 1998 Holographic Will. The jury heard that Theresa was disappointed in her children and felt that she had to support them during their lives (except for Randall) and that she had, in fact, discussed leaving her estate to charity at one time. The jury could have concluded that Cherye's loss of her mother's financial support motivated her to assert the continued validity of the 1998 Holographic Will. *See Estate of Longron*, 211 S.W.3d 434, 442 (Tex. App.—Beaumont 2006, pet. denied) (noting jury could disregard will proponent's claimed good faith and "reasonably conclude[] that [proponent's] pecuniary interests motivated him to attempt to probate the Will"). There were also significant factual circumstances that, the jury could have concluded, should have

36

led Cherye to question whether the 1998 Holographic Will continued to express Theresa's desires regarding the disposition of her estate. For example, the 1998 Holographic Will expressly disinherited a husband to whom Theresa was no longer married at the time of her death. And, sometime after the 1998 Holographic Will was drafted, Theresa inherited a sizable estate from her employers, including a home in River Oaks. The jury could have also considered the fact that Cherye knew that her mother had twice drafted subsequent wills—the October 14, 2017 Holographic Will then the October 19, 2017 Admitted Will—as evidence that Cherye knew that her mother's 20-year-old Holographic Will no longer expressed her testamentary intent. Finally, because Cherye produced no evidence of forgery, which she asserted at trial to attack the Admitted Will, the jury could have concluded that Cherye knew that her mother had signed a subsequent will but sought to admit the 20-year-old Holographic Will anyway.

Although the jury was free to believe that Cherye acted in good faith based on her own testimony that she did so, it was also free to disbelieve the same testimony, especially in light of the evidence that Cherye's financial situation would benefit if the 20-year-old Holographic Will were to be admitted to probate, Cherye had been the beneficiary of her mother's largesse during her lifetime and that would discontinue if the Admitted Will were probated, Cherye knew that Theresa's personal and financial situation had changed significantly since the 1998

Holographic Will was drafted, and Cherye also knew that Theresa drafted at least two wills after she drafted the 1998 Holographic Will.

Because the evidence does not conclusively establish Cherye's good faith, *see Kam*, 484 S.W.3d at 654, we overrule Cherye's legal-sufficiency challenge to the jury's finding that she lacked good faith in attempting to probate the 1998 Holographic Will.

We overrule issue four.

## CONCLUSION

We affirm the trial court's judgment.


        Sherry Radack
        Chief Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.